UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

TABATHA GONZALEZ,

    Plaintiff,

v.                                                          Case No. 1:10-CV-392

DOLGENCORP, INC., et al.,                        HON. GORDON J. QUIST

    Defendants.
_____/

## OPINION

Plaintiff, Tabatha Gonzalez, claims that Defendant ("Dollar General"), violated the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1) by not paying Gonzalez overtime for hours worked in excess of 40 hours per week. Dollar General claims that Gonzalez is not entitled to overtime because she is a "bona fide executive" under 29 U.S.C. § 213(a)(1), and, therefore, not entitled to overtime pay.

Dollar General has moved to Strike Evidence Offered in Opposition to Defendant's Motion for Summary Judgment and has moved for summary judgment pursuant to Fed. R. Civ. P. 56. For the purposes of deciding the motion for summary, this court will consider the exhibits which Dollar General wishes the court to strike from the record. Furthermore, the court notes that Dollar General concedes that it did not pay Gonzalez overtime pay and that Gonzalez would be entitled to overtime pay if she is not a *bona fide* executive under FLSA.

For the reasons stated in this Opinion, Dollar General's motion for summary judgment will be granted.

### Gonzalez's Work

- Gonzalez was hired, resigned and rehired as a clerk, earning $6.00 per hour, twice between 1999 and May 2001. (Gonzalez 2005 Dep. at 18, 21-22; Gonzalez 2011

    Dep. at 11-12.)  Gonzalez was promoted to Store Manager on July 10, 2001, and remained employed as the Store Manager of Dollar General until June 6, 2003.[1] (Gonzalez 2005 Dep. at 18; Gonzalez 2011 Dep. at 12-13, 42-43.)  Gonzalez earned weekly salaries of $450.00 in 2001, $528.85 in 2002, and $544.71 in 2003. (Gonzalez 2011 Dep. at 263-64.)  Gonzalez was eligible to earn a yearly bonus of up to $10,000.00.

- As store manager, Gonzalez worked 60 to 70 hours a week.  (Gonzalez 2011 Dep. at 328.)[2]  (For the first 20 weeks as Store Manager after being promoted, Gonzalez maintained contemporaneous time records.  (*Id.* at 359-61; Gonzalez 2011 Dep. Ex. 61, Payroll Records.)  During these weeks, her hours fluctuated from 34 to 70 hours, with an average of about 56 hours per week.  (Gonzalez 2011 Dep. Ex. 61 at 2-5.))

- Gonzalez estimated that spent 85 percent of her time on manual labor duties. (Gonzalez 2011 Dep. at 334.)  Gonzalez said that if she worked 60 hours in a week, approximately 30 to 40 of those hours were used stocking the shelves.  (*Id.* at 219.) Additionally, she spent some of her time mopping and sweeping the floor, cleaning the parking lot, restroom, and windows, running the cash register, and taking out the trash.  (*Id.* at 329-330, 332, 333.)  Gonzalez decided to perform clerical or manual-labor tasks, rather than delegating them to others, based on her own judgment.  (*Id.* at 355.)  Though, due to the lack of payroll hours the District Manager allotted to Gonzalez's store,[3] it was difficult for Gonzalez to delegate all of the duties. (Gonzalez 2005 Dep. at 90-91.)

---

[1] Gonzalez worked at Store No. 7639 in Sparta, Michigan.

[2] 60 to 70 hours a week is the amount that Gonzalez used in her motion.  Gonzalez originally claimed that she worked 70 to 80 hours a week during her time as Store Manager.  (Gonzalez 2005 Dep. at 150.)

[3] Gonzalez had 165 labor budget hours to delegate.  (Gonzalez 2011 Dep. at 299.)

2

- Gonzalez was the only person in the store who could enforce polices on a day-to-day basis. (Gonzalez 2011 Dep. at 31-32.) She served the human resources function of answering questions about company policies. (*Id.*) Gonzalez also ensured that employees knew, understood, and followed safe-work policies and anti-discrimination policies. (*Id.* at 34, 35.) Gonzalez had the responsibility to collect new hire paperwork from employees at her store, including tax and immigration compliance forms and acknowledgments of company policies. (*Id.* at 12, 36.)

- Gonzalez conducted annual performance reviews for clerks and ASMs at her store, which required her to assess several different categories of performance based on her daily supervision of those employees. (*Id*. at 128-30.) Gonzalez said that she was in the best position to evaluate the job performance of her employees. (*Id*. at 131.) Gonzalez met with employees individually to provide feedback and suggestions for areas of improvement. (*Id.* at 129.) Informally, she provided coaching on a daily basis to other employees. (*Id.*) The DM reviewed the performance evaluations that Gonzalez completed. (*Id.* at 339.)

- As Store Manager, Gonzalez used her own discretion to determine how to best apportion the work among store employees. (*Id.* at 142-43.) She used her discretion in making and prioritizing work assignments based on her perceptions of the particular strengths and weaknesses of each employee. (*Id.* at 217-18.)

- Gonzalez played an integral role in the hiring and firing of employees at her store. Gonzalez personally reviewed and evaluated job applications, selected the candidates to interview for a position, conducted the interviews, and ordered background checks for prospective hires. (*Id.* at 180-81.) During her employment as Store Manager, she made twenty or more hiring recommendations, and, although the DM had to approve

3

   her recommendations, Gonzalez does not recall any instance in which a DM denied a recommendation. (*Id.* at 160, 171-74, Gonzalez 2005 Dep. at 142.) Likewise, the DM had to approve any of Gonzalez's termination or promotion recommendations.

- Gonzalez also had the responsibility to train her store's employees. She taught her ASM the functions needed to assist her as the Store Manager. (Gonzalez 2011 Dep. at 51-52.) Moreover, Dollar General relied on her to ensure that her store team was properly trained. (*Id.* at 52.) Additionally, Gonzalez even trained employees at other locations, including Store Managers. (*Id.* at 145, 147-48.)

- Gonzalez had to ensure that on days when inventory arrived ("truck days"), her store complied with Dollar General's policy of unloading the delivery truck within 24 hours. (Gonzalez 2011 Dep. at 81.) This task was very labor intensive. (*See* Pl.'s Ex. 3.) Therefore, Gonzalez scheduled her employees to ensure that, on truck days, she had sufficient employees to unload the truck and maximize productivity. (Gonzalez 2011 Dep. at 67-68.) Sometimes, this required deciding to have employees stay late to finish processing the truck. (*Id.* at 79-80.)

- Dollar General operates its stores according to its SOP manual. The SOPs are very detailed and provide employees with responses to a vast number of situations. While Gonzalez used the SOP manual at least once a week, there were many decisions that she had to make using her own judgment without referencing the SOPs.

- Gonzalez also had to decide what products to put in the store's "flex space" and end caps. (*Id.* at 220.) She made her decisions based on what she believed would promote higher sales. (*Id.*) The DM had the ultimate say on what products were placed in the end caps and would sometimes alter Gonzalez's decision. (Gonzalez 2005 Dep. at 162.)

- When Gonzalez worked at the same time as other employees, she said that she watched them at all times to ensure tasks were being productively accomplished. (*Id.* at 68-69.) She also always monitored the customer service being provided in the store. (*Id.* at 88-89.) Moreover, she always had to be prepared to answer employee questions, check in vendors, monitor shoplifting, handle telephone calls, or address other unplanned issues. (*Id.* at 225-26.)

- Gonzalez managed her store with the performance evaluation criteria in mind. (*Id.* at 262.) Gonzalez performed each of the following tasks as Store Manager and said that each were "important": providing employment information to the human resources center so that new employees could be set up in the payroll system and changes in wage rates would be timely reflected; managing the store's markdowns of merchandise; allocating the store's payroll budget and ensuring that all employees stayed busy and productive during each shift; ensuring that merchandise was not damaged during the truck delivery process; safeguarding the store's inventory from damage or theft; ensuring that all employees followed proper cash handling procedures; conducting investigations into customer injuries that occurred in the store; maintaining the store's paperwork and analyzing cashier activity in order to detect fraud; monitoring transactions at the cash register to ensure that the "one scan" policy is being followed by the cashiers; controlling the receiving of merchandise from vendors in the store; and recruiting, hiring and training of store employees. (*Id.* at 36, 59, 68, 74, 87, 128, 160-61, 191-92, 207-08, 242-43, 266, 302-03, 369-70, 374-75.)

- Even though Gonzalez did a lot of manual-labor work, she did not think that her store could have operated if employees were not hired, scheduled, paid, and trained -

5

      all tasks in which she played an integral role. (*Id.* at 254-55, 299.) Moreover, Gonzalez said that a store's success depends on the Store Manager performing managerial tasks, not manual-labor tasks such as cleaning or putting merchandise on the shelf. (*Id.* at 301-02.) Gonzalez also said that the most important tasks she did to make her store profitable were to work inventory out of the backroom and watch shrink (theft) issues. (Gonzalez 2005 Dep. at 159-60.)

- During her employment, the DMs would visit Gonzalez's store on a monthly basis, and, on occasion, more than once a week. (Gonzalez 2011 Dep. at 9-10.) Those visits would last 20 to 30 minutes or longer depending on the nature of the visit. (*Id.*) Gonzalez said that she spoke to the DM for about 30 minutes per week, but the amount of in-person and telephone communication varied. (*Id.* at 136-39.) On a day-to-day basis, Gonzalez was the leader of the store and the person "in-charge." (*Id.* at 262-63, 294, 353.)

### **Applicable Standards to Determine Whether Gonzalez Was a *Bona Fide* Executive**

Although no two cases are ever identical in every respect, this court believes this case to be governed by *Thomas v. Speedway Superamerica, LLC*, 506 F.3d 496 (6th Cir. 2007). In *Speedway*, the plaintiff claimed unpaid overtime, but the circuit court upheld the district court's grant of summary judgment to the employer on the grounds that she was a *bona fide* executive employee. The *Speedway* court held that the determination of whether an employee's primary duty is management under the regulations is not determined by whether the employee spends most of her time on management activities. Rather, "primary" means the principal, main, major, or most important duty that the employee performs. *Id.* at 504. Furthermore, *Speedway* recognizes that managerial and non-managerial tasks are not always severable. *Id.* at 504.

The facts of Speedway are strikingly similar to the facts in the instant case:

1. The defendant operated a chain of stores which were visited periodically by a district manager.

2. Plaintiff was hired as store manager.

3. The store managers worked more than 40 hours per week.

4. The salaries were over the threshold of the short test for determining whether someone could be considered a *bona fide* executive.

5. The plaintiff was entitled to earn a bonus.

6. A majority of the time spent by the plaintiff (60%) was spent on non-managerial tasks, such as stocking merchandise, sweeping floors, cleaning bathroom, operating the register, and performing routine clerical duties.

7. The primary duty was to manage the store which required her to do management functions: supervising, training, interviewing, hiring and disciplining employees; preparing weekly work schedules; resolving employee complaints; monitoring employees' performance with formal evaluations; recommending salary increases; recommending employee terminations; sometimes terminating employees without prior approval of her district manager.

Taking the facts in the light most favorable to Gonzalez, she testified that she spent 85% of her time on non-managerial duties. However, time alone is not the sole test to determine whether an employee has management as her primary duty. 29 C.F.R. § 541.103 (2003); *see Speedway*, 506 F.3d at 504 (store manager spent less than fifty percent of her time in management-related activities); *Murray I*, 939 F.2d at 618 (stating that "[t]he district court's finding that the managers spent 65-90 percent of their time on non-managerial duties . . . is not a controlling factor under the regulations"); *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011) (99 percent); *Baldwin v. Trailers Inns, Inc.*, 266 F.3d 1104, 1113-16 (9th Cir. 2001) (90 percent). "More

importantly, however, the time factor is less momentous, and might even be 'somewhat misleading,' where 'the employee's management and non-management functions are [not] . . . clearly severable.'" *Speedway*, 506 F.3d at 504 (citing *Burger King I*, 672 F.2d at 226).  Here, Gonzalez said that, no matter what task she was performing, she *always*: watched the employees at all times to ensure tasks were being productively accomplished; monitored the customer service being provided in the store; and remained prepared to answer employee questions, check in vendors, monitor shoplifting, handle telephone calls, or address other unplanned issues.  Thus, just as the plaintiff in *Speedway*, Gonzalez's non-managerial duties often overlapped with her managerial duties.

Where an employee manages the store while at the same time performing non-exempt tasks normally delegated to the subordinate employees, the Court should not give undue weight to the time factor of the "primary duty" inquiry.  *Id.* at 504 (citing 29 C.F.R. § 541.103 (2003)).[4]

"[I]n situations where the employee does not spend over 50 percent of [her] time in managerial duties, [she] might nevertheless have management as [her] primary duty if the other pertinent [factors] support such a conclusion."  29 C.F.R. § 541.103 (2003).  These factors include:

(1) "the relative importance of the managerial duties as compared with other types of duties";

(2) "the frequency with which the employee exercises discretionary powers";

(3) "[the employee's] relative freedom from supervision"; and

(4) "the relationship between [the employee's] salary and the wages paid other employees for the kind of nonexempt work performed by [her]."

*Id.*  Importantly, Dollar General must establish, by a preponderance of evidence, the primary-duty element of the bona-fide executive exemption as a whole, not each individual factor relevant to that

---

[4] Instructively, this regulation goes on to state that an employee whose work requires her to simultaneously engage in managerial and non-managerial duties "will be considered to have management as [her] primary duty" even though she "generally spends more than 50 percent of [her] time in production . . . work." 29 C.F.R. § 541.103 (2003).

8

inquiry. *Speedway*, 506 F.3d at 505 n.6.[5]

    1.    <u>Relative Importance of Managerial Duties</u>

The first factor considers "the relative importance of the managerial duties as compared with other types of duties." "Courts must compare the importance of the plaintiff's managerial duties with the importance of her non-managerial duties, keeping in mind the end goal of achieving the overall success of the company." *Id.* at 505. The court in *Speedway* analyzed this factor as follows:

> Under a proper analysis of this factor, we consider [the plaintiff's] non-managerial duties on the one hand, which include stocking merchandise, sweeping floors, and cleaning bathrooms. And, on the other hand, we consider [the plaintiff's] managerial duties, which include hiring employees, training employees, and assigning the weekly work schedule. If [the plaintiff] failed to perform her nonmanagerial duties, her [gas] station would still function, albeit much less effectively. . . . If, however, [the plaintiff] failed to perform her managerial duties, her [gas] station would not function at all because no one else would perform these essential tasks. Surely, a gas station cannot operate if it has not hired any employees, has not scheduled any employees to work, or has not trained its employees on rudimentary procedures such as operating the register. We therefore conclude that [the plaintiff's] managerial duties were much more important to [the gas station's] success than her non-managerial duties. Accordingly, we find that the first factor strongly indicates that [the plaintiff's] primary duty consisted of management.

*Speedway*, 506 F.3d at 505-06 (citation omitted).

This Court could essentially interchange Gonzalez and Dollar General for 'the plaintiff' and 'the gas station,' respectively, in *Speedway*'s analysis. Among other things, Gonzalez acted as the human resources contact for employees; she evaluated applications, interviewed potential candidates, and made at least 20 hiring recommendations that were approved by the district manager; she set the schedule for her employees; she trained the store's employees on the most basic of tasks; she handled her store's paperwork; and ensured her employees implemented the company's corporate directives. The Dollar General store, at which Gonzalez was the Store Manager, could not have operated without Gonzalez performing these tasks. If she failed to perform her non-

---

[5] By making this statement, the court implied that, even though a defendant may not be able to carry its burden as to all of the factors, that defendant could still be able to carry its burden as to the exemption as a whole.

9

managerial tasks, her store would still function, but much less effectively.

Gonzalez argues that she did not perform all of these tasks because her DM had to approve of her actions or could have performed them himself. This argument is unavailing. As *Speedway* noted analyzing another factor, any employee in a corporate setting could make this same claim, except for the CEO of the company. Furthermore, the DM could not have performed these tasks. A DM keeps an eye on 15 to 25 stores, and only visits each store on very limited occasions.

Gonzalez also argues, by relying on a case from the Western District of Virginia, that she spent significant time alone in the store, and therefore she performed duties of an hourly employee and supervised no one. *See Hale v. Dolgencorp, Inc.*, 2010 WL 2595313 (W.D. Va. June 23, 2010). This argument fails for three reasons. First, this Court is not bound by that decision. Second, even as that court stated, "it is not particularly helpful to compare [the plaintiff's] situation to that of other discount store managers, . . ." because the factors depend on the facts of each case. *Id.* at *3. Third, the plaintiff in *Hale* spent 4 or 5 hours alone *each day*, whereas Gonzalez said that she spent 10 hours alone each week - significantly less. *Compare id.* at *3, *with* Gonzalez 2011 Dep. at 331.

Thus, taking the facts in the light most favorable to Gonzalez, with respect to the first factor, a reasonable trier of fact could not find for Gonzalez. Accordingly, this Court finds that the first factor strongly indicates that Gonzalez's primary duty consisted of management.

2. The Frequency Gonzalez Exercised Discretionary Powers

The second factor examines the frequency that Gonzalez exercised discretionary powers. Courts should focus on the prevalence or regularity of the plaintiff's discretionary decisions; an employee's exercise of discretion over matters of importance strengthens the employer's showing under this factor. *Speedway*, 506 F.3d at 506. As a matter of law, active supervision and periodic visits by a district manager do not eliminate discretion of the on-site store manager. *Id.* at 506-07 (citing *Murray v. Stuckey's Inc. (Murray II)*, 50 F.3d 564, 570 (8th Cir. 1995)).

10

As in *Speedway*, Gonzalez "*daily* exercised discretion over matters vital to the success" of her Dollar General store. *See Speedway*, 506 F.3d at 507. Gonzalez interviewed and recommended for hire at least twenty employees, delegated work among her employees, resolved unplanned issues, determined the weekly work schedule, evaluated her employees' performance, handled human resource issues, and determined how to train new employees. The DM's oversight does not fully detract from these discretionary decisions. The DM would visit Gonzalez's store only on occasion, ranging from monthly to twice a week.[6] According to Gonzalez, those visits would typically last an hour or two, with variations, depending on the nature of the visit, and, on top of that, she only spoke to the DM about 30 minutes per week otherwise.

Therefore, *Speedway*, with strikingly similar facts, controls. Even though Gonzalez's "discretion was by no means unfettered and abounding, she exercised discretion over important managerial functions on a sufficiently frequent basis to support a finding that management was" Gonzalez's primary duty. *Id.* at 507. Thus, the second factor indicates that Gonzalez's primary duty was management.

### 3. Relative Freedom from Supervision

The third factor considers Gonzalez's relative freedom from supervision. Due to the similarity in facts, *Speedway*'s analysis mirrors this Court's analysis of this issue. It said:

> [The plaintiff] was the most senior employee at her station; no other on-site employee was her equal. Thus, on a day-to-day basis, she generally operated without a supervisor looking over her shoulder, monitoring her every move. In an attempt to undermine the obvious degree of autonomy inherently associated with being the most senior on-site employee, [the plaintiff] argues that she was not free from supervision because her district manager constantly monitored her job performance, both in person and by means of telecommunications. . . . The record indicates that

---

[6] This Court does not need to determine the exact amount of visits the DM conducted each week. Though, taking the facts in the light most favorable to Gonzalez, no reasonable juror could find a DM visited more than twice a week. Given that a DM oversaw 15 to 25 stores a week, taking into account travel time between stores, and also Gonzalez's testimony that DMs would visit for an hour or two, and sometimes up to four or five hours, it is nearly impossible that a DM could have visited each store more than twice a week. On top of that, company executives wanted DMs to visit each store once every 4 to 6 weeks, indicating the regularity with which DM visits occurred.

11

> [the DM] visited [the plaintiff's] store approximately once or twice a week, communicated with [the plaintiff] frequently via phone and email, and remained constantly available to address her concerns. While these facts establish that [the plaintiff] was not completely free from oversight, we reiterate that the third factor considers only the "*relative* freedom from supervision"; it does not demand complete freedom from supervision, such that she is answerable to no one, as this would disqualify all but the chief executive officer from satisfying this factor of the primary duty inquiry.

*Id.* at 507. Furthermore, as *Speedway* noted, the cases that found retail store managers were not exempt, due to the level of supervision by a superior, differ significantly from this case. *Id.* at 508 (comparing *Smith v. Heartland Auto. Servs., Inc.*, 418 F. Supp. 2d 1129, 1137 (D. Minn. 2006) (DMs visited the stores every day of the week for hours at a time) and *Cowan v. Treetop Enters., Inc.*, 120 F. Supp. 2d 672, 675 (M.D. Tenn. 1999) (DMs only managed three units in a defined area)). The court in *Speedway* said that the DM supervised ten to twelve stores, and, thus, the "weight of the case law confirms that she was relatively free from supervision." *Speedway*, 506 F.3d at 508. Nor did the DM's availability by phone or email detract from that finding. *Id.*

Here, the average DM for Dollar General oversaw 15 stores, and up to 25. Furthermore, Gonzalez's DM visited her store, viewing the facts most favorable to her, not more than twice a week. Additionally, the DM's availability through telephone and email is noted, but it does not substantially detract from Gonzalez's relative freedom from supervision.

Therefore, the striking similarities between Gonzalez and *Speedway* requires this Court to find that Gonzalez's relative freedom from supervision supports Dollar General's contention that her primary duty was management.

    4.    <u>Relationship Between Salary and Wages Paid Other Employees</u>

The fourth factor looks at the relationship between Gonzalez's salary and the wages paid other employees for the kind of nonexempt work performed by her. Instructively, the court in *Speedway* first calculated the plaintiff's hourly earnings by using the plaintiff's weekly salary at the time of her termination and the number of hours that she worked. *Id.* Then, the court compared the

12

hourly earnings of the plaintiff, $10.44, with that of the plaintiff's subordinate employees, who earned $7.00 per hour. *Id.* at 509. There, the plaintiff's hourly earnings were a "significant amount - approximately thirty percent – more than the hourly wages paid to other employees for the kind of nonexempt work performed by her." *Id.* Second, the court compared the plaintiff's gross salary, $21,947.00, to that of the next highest grossing employee at that location, who earned $13,943.00. These two comparisons led the court to conclude that the fourth factor weighed in favor of a finding that management was the plaintiff's primary duty.

The court also noted that "[t]here are many variables that might affect this estimated hourly rate." *Id.* at 508. For example, the plaintiff testified she worked a lot more than fifty hours a week. *Id.* Also, the plaintiff was eligible to participate in a bonus program, which had the ability to "significantly increase" her hourly earnings. *Id.*

Here, Gonzalez earned a weekly salary of $544.71 when her employment ended. Viewing the facts in the light most favorable to Gonzalez, this Court can, at best, assume that she worked 60 hours per week.[7] This meant that Gonzalez's hourly earnings was $9.07 in 2003.[8] Comparing the $9.07 that Gonzalez made at the end of her employment to the $7.00 per hour that an ASM made, Gonzalez made 29 percent more than her nearest subordinate. Furthermore, a comparison of the weekly salaries shows that Gonzalez made nearly twice as much as a full-time ASM. These comparisons, which are the same made by the court in *Speedway*, are sufficient to support a finding that the fourth factor, like the other three, weighs in favor of a finding that management was

---

[7] There is no better evidence of the time that Gonzalez worked than the time sheets that Gonzalez kept herself during the first 20 weeks of her employment as Store Manager. The time sheets indicate an average of *56 hours* per week. Furthermore, Gonzalez said under oath that she spent about the same amount of time working after those first 20 weeks. However, this Court, for purposes of erring in favor of Gonzalez, takes her word that she worked at least 60 hours per week. Moreover, even though Gonzalez claims that she worked more than 60 hours some weeks, the plaintiff in *Speedway* also said that she worked more than 55 hours, but the court used 55 hours in that analysis, and so the Court chooses to use 60 hours.

[8] Of course, like *Speedway*, these numbers could fluctuate depending on the accuracy of Gonzalez's estimate, or by looking at Gonzalez's potential for a bonus. Though, we make our calculations by viewing the facts in a light most favorable to Gonzalez, while being guided by *Speedway*.

13

Gonzalez's primary duty. This Court adds that Gonzalez had the ability to earn a $10,000.00 bonus, and thus could treat her work as a "profit center" – another variable weighing in favor of the fourth factor. *See In re Family Dollar Litig.*, 637 F.3d at 517.

Gonzalez's argument that centers around manipulating the calculations is unavailing for several reasons. First, *Speedway* made clear what numbers can be compared to evaluate the fourth factor. Second, this Court believes that using 60 hours per week as Gonzalez's standard is going beyond a reasonable inference given the objective time records that Gonzalez herself recorded. Third, even if Gonzalez's argument had any merit, her final conclusion is that Gonzalez was paid slightly more than the manual labor workers. This would not outweigh the overwhelming weight of the first three factors, which all clearly support management being Gonzalez's primary duty. Indeed, as *Speedway* noted, the Court need not find each *factor* in favor of Dollar General, but only a preponderance of evidence on the "primary duty" element as a whole. *Speedway*, 506 F.3d at 505 n.6.

A rational trier of fact, taking all inferences in light most favorable to Gonzalez, could not find that the fourth factor weighs in favor of Gonzalez.

## Conclusion

Finding that there is no genuine issue of material fact as to whether Gonzalez is a *bona fide* executive, Defendant's Motion for Summary Judgment will be granted.

A separate Order and Judgment will issue.


Dated:  December 1, 2011                                /s/ Gordon J. Quist
                                                       GORDON J. QUIST
                                                UNITED STATES DISTRICT JUDGE